# 22-1687

## United States Court of Appeals
## for the Second Circuit

GORDON SPRINGS,

*Plaintiff-Appellant,*

*against*

CITY OF NEW YORK, CHARLES SWIFT, individually and in
his respective capacity as a member of the Fire
Department of the City of New York, PETER GRILLO,
individually and in his respective capacity as a member
of the Fire Department of the City of New York,

*Defendants-Appellees.*

*(caption continued on inside cover)*

On Appeal from the United States District Court
for the Southern District of New York

### BRIEF FOR APPELLEES THE CITY OF NEW YORK,
### DANIEL A. NIGRO, AND EDWARD VREELAND

RICHARD DEARING
DEVIN SLACK
BENJAMIN H. POLLAK
  *of Counsel*

March 17, 2023

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel
of the City of New York*
Attorney for Appellees the City
of New York, Daniel A. Nigro,
and Edward Vreeland
100 Church Street
New York, New York 10007
212-356-0843 or -2502
bpollak@law.nyc.gov

*(caption continued from cover)*

FIRE COMMISSIONER DANIEL A. NIGRO, individually and in his respective capacity as a member of the Fire Department of the City of New York, PEDRO ARISTY, individually and in his respective capacity as a member of the Fire Department of the City of New York, LIEUTENANT EDWARD VREELAND, individually and in his respective capacity as a member of the Fire Department of the City of New York.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................iii

PRELIMINARY STATEMENT ..................................................... 1

ISSUE PRESENTED FOR REVIEW ............................................ 3

STATEMENT OF THE CASE ...................................................... 3

    A.  The pleadings in this case and the district court's grant of partial summary judgment to defendants ................................. 4

    B.  The court's order of a separate trial for the City, Springs's voluntary dismissal of his claims against the individual firefighters, and the long delay in trying the case .................... 5

    C.  The trial of Springs's claims against the City ........................... 8

        1. The court's relevant rulings in limine ................................. 8

        2. The evidence at trial ........................................................... 9

            a.  Springs's testimony about the two alleged hazing incidents, and his documented struggles with paranoid ideation ........................... 10

            b.  Springs's allegations of retaliation and the evidence that each alleged act was an ordinary occurrence or legitimate business decision ................................................................. 11

        3. Springs's transfer to Engine 67 and the court's instruction to disregard his testimony about events after the transfer ................................................................ 15

    D.  The defense's motion for judgment as a matter of law and the jury's unanimous defense verdict ...................................... 16

i

# TABLE OF CONTENTS (cont'd)

**Page**

STANDARD OF REVIEW AND SUMMARY OF ARGUMENT ........... 17

ARGUMENT ........................................................................... 19

    THIS COURT SHOULD AFFIRM THE JUDGMENT
    ENTERED ON THE JURY'S UNANIMOUS VERDICT .............. 19

    A. The district court soundly exercised its discretion in
        ordering a separate trial for the City. ...................................... 19

        1. Bifurcation eliminated the possibility of prejudice. ............. 19

        2. Springs's claim that he lacked time to prepare for trial
           after bifurcation withers under scrutiny. ............................. 23

    B. Springs's claims of judicial bias are unpreserved and
        unfounded. ................................................................ 25

CONCLUSION .................................................................... 30

CERTIFICATE OF COMPLIANCE ........................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Altria Group Inc. v. U.S.*,
    658 F.3d 276 (2d Cir. 2011) ............................................................ 9, 15

*Amato v. City of Saratoga Springs*,
    170 F.3d 311 (2d Cir. 1999) .............................................. 18, 19, 20, 22

*Deposit Guar. Nat'l Bank v. Roper*,
    445 U.S. 326 (1980).......................................................................... 24

*Henderson v. City of N.Y.*,
    571 F. App'x 42 (2d Cir. 2014) .......................................................... 27

*Liteky v. U.S.*,
    510 U.S. 540 (1994)..................................................................... 26, 27

*Nemaizer v. Baker*,
    793 F.2d 58 (2d Cir. 1986) ................................................................ 25

*Smith v. Lightning Bolt Prods.*,
    861 F.2d 363 (2d Cir. 1988) .............................................................. 19

*Springs v. City of N.Y.*,
    No. 1:19-cv-11555-AKH, 2020 U.S. Dist. LEXIS 112413
    (S.D.N.Y. June 26, 2020) ..................................................................... 9

*Matter of United States*,
    733 F.2d 10 (2d Cir. 1984) ................................................................ 22

*United States v. Canniff*,
    521 F.2d 565 (2d Cir. 1975) .............................................................. 25

*United States v. Cusack*,
    229 F.3d 344 (2d Cir. 2000) .............................................................. 23

iii

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*United States v. Elfgeeh,*
515 F.3d 100 (2d Cir. 2008) ............................................................... 29

*United States v. English,*
629 F.3d 311 (2d Cir. 2011) ............................................................... 27

*United States v. Mickens,*
926 F.2d 1323 (2d Cir. 1991) ............................................................ 28

*United States v. Mulder,*
273 F.3d 91 (2d Cir. 2001) .......................................................... 19, 25

*United States v. O'Connor,*
650 F.3d 839 (2d Cir. 2011) .................................................. 18, 23, 24

*United States v. Salameh,*
152 F.3d 88 (2d Cir. 1998) ................................................................ 28

*United States v. Vega,*
589 F.2d 1147 (2d Cir. 1978) ............................................................ 25

*Vichare v. AMBAC Inc.,*
106 F.3d 457 (2d Cir. 1996) ............................................................. 20

**Statutes**

42 U.S.C. § 1981 ................................................................................. 5

42 U.S.C. § 1983 ................................................................................. 5

42 U.S.C. § 1985 ................................................................................. 5

42 U.S.C. § 1986 ................................................................................. 5

Civil Rights Act of 1964, Title VII ................................................. 4, 5

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

## Other Authorities

Federal Rule of Civil Procedure 21 ............................................................. 5

Federal Rule of Civil Procedure 42(b) ............................................ *passim*

## PRELIMINARY STATEMENT

Plaintiff-appellant Gordon Springs filed two equal employment opportunity (EEO) complaints with the New York City Fire Department after he was allegedly subjected to hazing incidents in 2015. The FDNY thoroughly investigated the complaints, disciplined the responsible firefighters, and devoted substantial resources to helping Springs succeed in the Department. Springs subsequently sued the City, its Fire Commissioner, an FDNY lieutenant, and three fellow firefighters in the U.S. District Court for the Southern District of New York for a wide range of claims under federal and state law related to the original incidents and alleged retaliation for filing the EEO complaints.

After most of Springs's claims were dismissed at summary judgment, the district court ordered separate trials: one for Springs's retaliation claims, his only surviving claims against the City, and the other for his claims against the individual firefighters for the hazing incidents. Springs had his day in court, and a jury returned a unanimous defense verdict on the retaliation claims. This Court should affirm the judgment below.

On appeal, Springs does not challenge the district court's summary judgment determination or the sufficiency of the evidence supporting the verdict. Instead, he argues that the court's order of a separate trial for his claims against the City prevented him from mounting evidence of the alleged hazing and denied him adequate time to adjust his trial strategy. He is mistaken. The district court did not abuse its discretion by ordering separate trials because Springs's allegations against the individual firefighters—all of which occurred before he filed the EEO complaints— were distinct from his retaliation claims against the City, and because receiving extended evidence about those allegations during a trial of the retaliation claims risked confusing the jury and prejudicing the City. Nor was Springs's litigation strategy upended on the eve of trial, as he maintains; in fact, the parties had over two and a half years to prepare for trial after the court's bifurcation order.

Finally, Springs argues that Judge McMahon, who presided at trial, made improper comments in the jury's presence. This argument is unpreserved for appellate review because Springs made no objection to the judge's comments. In any event, Springs only cites two examples of the court's supposed misconduct, neither of which showed bias, let alone

such pervasive bias that the jury could not have reached a fair verdict. On the contrary, Judge McMahon conducted the trial fairly and efficiently, and the jury's unanimous defense verdict was amply supported by the evidence.

## ISSUE PRESENTED FOR REVIEW

Should this Court affirm the judgment below where (a) the district court did not abuse its discretion in ordering a separate trial on the distinct claims against the City, (b) Springs had more than two and a half years after the bifurcation order to prepare for trial, and (c) Judge McMahon conducted the trial in a fair and impartial manner?

## STATEMENT OF THE CASE

This case stems from two EEO complaints that plaintiff-appellant Gordon Springs filed with the FDNY in October 2015 (Appendix ("A") 312–24). Springs, who identifies as male, "mixed race," and Black, alleged that he had been subjected to two discriminatory hazing incidents shortly after joining the Department several months earlier (A312; Special Appendix ("SPA") 2). The FDNY investigated the complaints, disciplined seven firefighters, and worked closely with Springs to address his concerns (*see* A330–31, 647, 899).

3

Springs subsequently brought this lawsuit against the City of New York, FDNY's then-Commissioner Daniel A. Nigro, FDNY Lieutenant Edward Vreeland, and three other firefighters, raising federal and state law claims related to the hazing incidents and alleged retaliation for filing the two EEO complaints (*see* A36–73). After his retaliation claims against the City survived summary judgment (*see* SPA35), the district court ordered a separate trial for the City (A449). Springs now appeals from the judgment entered after the unanimous defense verdict in that trial.

## A. The pleadings in this case and the district court's grant of partial summary judgment to defendants

Springs commenced this action in January 2017 by filing a complaint in the Southern District of New York (*see* A36–73). His complaint alleged that he had been subjected to two hazing incidents while a probationary firefighter in 2015, and that various FDNY employees who were not involved in the hazing had retaliated against him for filing EEO complaints about the incidents (*see* A41–56). Springs sought damages for common law assault and battery and for harassment, discrimination, and retaliation in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §§ 1981, 1983, 1985, and 1986, the New York State Human Rights Law, and the New York City Human Rights Law (*see id.*).

After discovery, the City and all but one of the individual defendants moved separately for summary judgment (SPA8). Judge Nathan, who was assigned to the case at the time, granted the motions in part, dismissing all the claims against the City except for unlawful retaliation under Title VII and the city and state human rights laws (SPA35). It thus dismissed all claims against the City related to the alleged hazing by the individual firefighters (*see* SPA28, 31, 35). The court also dismissed all claims against Commissioner Nigro and Lieutenant Vreeland (SPA9–12). And it dismissed all claims against the two individual firefighters who had moved for summary judgment, except for claims for hostile work environment/sexual harassment and aiding and abetting (SPA35).

### B. The court's order of a separate trial for the City, Springs's voluntary dismissal of his claims against the individual firefighters, and the long delay in trying the case

After summary judgment, the City moved under Federal Rules of Civil Procedure (FRCP) 21 and 42(b) for a separate trial of Springs's

retaliation claims (*see* A187–200). The City explained that Springs's claims against it and against the individual firefighters presented different legal and factual scenarios, since the allegations against the individual firefighters all pertained to the period before the two EEO complaints were filed, whereas the alleged retaliation by the City occurred after and involved different people (A192). Under these circumstances, evidence of the firefighters' alleged misconduct would only confuse the jury and prejudice the City, since the jury might impute liability for their conduct to the City (A249–51).

Springs opposed the motion (*see* A235–44), and Judge Nathan denied it (*see* A254–57). The court reasoned that holding two trials would inconvenience the court, that joinder of the claims remained permissible, and that any prejudice to defendants could be mitigated through limiting instructions (*id.*).

The case was subsequently reassigned to Judge Walter of the Western District of Louisiana, sitting by designation in the Southern District of New York (A22). Trial was set for November 12, 2019 (A258). At a conference on November 11, the court *sua sponte* bifurcated the claims under FRCP 42(b), ordering a separate trial for the City after the

6

individual defendants' trial (A449). The court noted that it had read the City's earlier motion for severance and bifurcation (A450). And it heard and considered Spring's counsel's argument that it would be prejudicial to Springs to order a separate trial for the City, noting that Springs would not be prejudiced because "[a]ll witnesses will be made available" (A450–51). At the same conference, Springs requested a continuance of the first trial so he could review documents the City had discovered and turned over the previous weekend (A451–52). The court granted a one-day continuance (A457–58).

The next day, Springs moved to dismiss his federal claims against the individual defendants without prejudice and requested that the court decline to exercise supplemental jurisdiction over his remaining state law claims against them (A445). His legal team indicated that, "[a]fter great deliberation and research," they had concluded that dismissal "was proper in light of the legal analysis which would apply to such claims" (*id.*).

The court granted the motion and, separately, ordered a continuance of the trial against the City to early February 2020, giving the parties an additional two and a half months to prepare (*see* A24, 447).

7

The court then continued the trial to April (*see* A26). But by then, the global COVID-19 pandemic had begun, and the district court, by standing order, continued the trial yet again (*see* A27).

In April 2021, the case was once again reassigned, this time to Judge McMahon (*see id.*). Trial was scheduled for mid-September 2021, and a jury was selected (*see* A28, 463). But by late September, after postponing the start date several times, the court was forced to discharge the jury, since Springs claimed to be unable to participate in the trial due to an undiagnosed, non-COVID-19 illness (*see* A462–65). The trial would not begin until July 2022, more than two and a half years after the bifurcation order (*see* A525).

## C. The trial of Springs's claims against the City

### 1. The court's relevant rulings in limine[1]

At a pretrial conference in July 2021, the court ruled that Springs, when called to testify, would be permitted to give a brief overview of the two incidents that led him to file the relevant EEO complaints in October 2015 (A472–73). But the court precluded Springs from testifying about

---

[1] Unless otherwise indicated, all further references to "the court" refer to Judge McMahon.

any alleged acts of retaliation that occurred after his transfer to the Engine 67 fire company in late 2017, since those events were the subject of a separate lawsuit that had already been dismissed with prejudice (A484–88; SPA36–52). *See Springs v. City of N.Y.*, No. 1:19-cv-11555-AKH, 2020 U.S. Dist. LEXIS 112413 (S.D.N.Y. June 26, 2020) (Hellerstein, J.).

### 2. The evidence at trial

At the trial of his retaliation claims against the City, Springs presented his own testimony and that of his treating psychiatrist, Dr. Elvin Ruiz. The defense, in turn, presented the testimony of retired FDNY Lieutenant David Obiesie, who served as the Department's Diversity Advocate, and Don Nguyen, the Department's Assistant Commissioner for EEO. Given the posture of the case, the facts are presented in the light most favorable to the City. *See Altria Group Inc. v. U.S.*, 658 F.3d 276, 279 (2d Cir. 2011).

### a. Springs's testimony about the two alleged hazing incidents, and his documented struggles with paranoid ideation

Even though the alleged acts of hazing were not at issue in this trial, Springs began his testimony with detailed descriptions of the two incidents (*see* A561–63). The jury heard, among other details, that shortly before graduating from the FDNY's training academy in May 2015, Springs was assigned to the Ladder 35 company and was given a tour of his new firehouse (A561). The tour ended in the gym, where four or five naked firefighters were waiting (A561–62). One firefighter held the door closed, and another firefighter told Springs to lie on a bench and then "placed his penis and testicles on [Springs's] forehead" (A562). The jury also heard that, a month or two later, Springs and two other probationary firefighters were made to climb the firehouse poll, and that buckets of water and bread crumbs were spilled on Springs when he reached the top, causing him to fall and injure his back and ankle (A562–63).

After the pole incident, Springs went on medical leave for approximately six months (A563–65). In October 2015, about two months after going on leave, he filed the two EEO complaints at issue in this lawsuit, one for each incident (A564).

While on leave, Springs also began seeing Dr. Ruiz, who diagnosed him with paranoid ideation, post-traumatic stress disorder, severe anxiety, major depression, and panic attacks (A719–20). Dr. Ruiz attributed these conditions to Springs's experiences at work, but he also explained that Springs had developed a "paranoid personality" that prevented him from trusting anyone and made him see danger everywhere he went (A738). As early as October 2015, months before the first alleged act of retaliation, Dr. Ruiz began working with Springs on "reality testing," which the doctor defined as "the ability to see reality for what it is as opposed to see[ing] a totally distorted reality" (A760). Over the following years, the doctor continued to try to help Springs gain a "rational view on what he perceives as threats" and "challenge faulty beliefs about his safety," but he conceded that Springs "has, basically, a treatment resistant condition" (A738, 760–62).

> **b. Springs's allegations of retaliation and the evidence that each alleged act was an ordinary occurrence or legitimate business decision**

At trial, Springs acknowledged that he was never formally disciplined by the FDNY and, indeed, was granted tenure, promoted

multiple times, and given regular raises that increased his annual salary from approximately $45,000 to $120,000 (A676–78, 703, 711). Nevertheless, he testified to multiple incidents of perceived retaliation by coworkers, supervisors, and Department executives (*see generally* A558–711).

The first such incident involved Springs's bunker coat, which he claimed had been defaced while he was on medical leave (A565–68). Springs testified that the coat had "several stab marks to the heart area" and other minor damage when he retrieved it from the Ladder 35 firehouse (A565–66). But the jury saw photographs of the coat, and Lieutenant Obiesie testified that it appeared to be in "[g]ood condition," with no damage that would make him suspect vandalism (A795–96). The lieutenant explained that the inside pocket looked "normal," and that it would be located near Springs's hip, anyway, not his heart (A796–98). In any event, Springs could not say whether the alleged damage had happened before or after he had filed the EEO complaints (*see* A697–99).

When Springs returned from leave, he was detailed, or temporarily assigned, to Ladder 40, which he interpreted as retaliation for filing the EEO complaints (*see* A573). But Assistant Commissioner Nguyen

explained that Springs was detailed to Ladder 40 because the Department believed he could have a "fresh start" there, since it was a "very well-regarded house culturally" (A859–61). Springs did not take advantage of the opportunity, however. He claimed that members of Ladder 40 isolated him and that he received a mixed performance evaluation in retaliation for his complaints (*see* A574–80). But his captain at Ladder 40 told Nguyen that Springs had created "tension" in the firehouse by refusing to follow its rules and customs—concerns that were reflected in the performance evaluation (A863, 873–75).

After Springs's struggles at Ladder 40, the FDNY tried to find an environment where he would thrive by detailing him to Engine 21, which had "a strong workplace climate that would allow [Springs] to grow in his position" (A862–64). And indeed, Springs testified that "everything was really great" at Engine 21 at first (A583). His perception of the company changed, however, after he noticed a prominently posted departmental order stating that seven firefighters had been disciplined for hazing, and that all members of the FDNY were to comply with the Department's strict no-hazing policy (A583–84, 647). Even though the order did not identify Springs, the disciplined firefighters, or their companies, Springs

immediately "panicked," believing it had been posted to warn his coworkers that he was a "rat" (A583–85, 647–48).

Springs's supervising lieutenant removed the order at Springs's request, and Nguyen spoke to Springs to reassure him (A865–69). Nevertheless, Springs began to feel targeted by coworkers, interpreting a missing mattress, loosened couplings on his air mask, and two screws in one of his boots as retaliatory acts (*see* A588–93). But the mattress soon reappeared (*see* A588). And the City's witnesses explained that air mask couplings are regularly loosened to change equipment, and that other members of the company had also found construction debris on their equipment around the same time, since the firehouse was undergoing major renovations (*see* A791, 950–51).

Despite these reassuring circumstances, Springs "panicked" when he saw the screws and began to fear for his life (A592–93, 669). The next day, he went on medical leave for approximately eight months (A594–95). While Springs was on leave, Lieutenant Obiesie and Nguyen met with him multiple times, and Nguyen vetted several firehouses to find a good fit for Springs (*see* A779, 782–83, 888–99). Nguyen finally settled on Engine 67, which he described as an "extremely well-regarded house, run

14

by a captain who had been on the job for a long time," and staffed by experienced firefighters who could mentor Springs (A862, 888–89).

Before the transfer, Nguyen spoke with Springs several times to try "to get him psyched up [for] coming back to duty" and to help prepare him for success at Engine 67 (A890–91, 900). Nguyen testified that, in his tenure as Assistant Commissioner of EEO, he had never spent so much time with a single firefighter and had never been so deeply involved in a single firefighter's placement (A899). After his last conversation with Springs, Nguyen learned that Springs had filed an EEO complaint against him (A901).

### 3. Springs's transfer to Engine 67 and the court's instruction to disregard his testimony about events after the transfer

Even though the court had precluded Springs from testifying about anything that happened after his transfer to Engine 67 (*see supra* at 8–9), Springs's counsel asked him why he had left that fire company (*see* A598). Over the defense's objection, Springs testified that he had left because he was being "shunned" and "isolated once again" (*id.*). When Springs further testified that he had subsequently been "scheduled for

15

termination," defense counsel requested a sidebar and reminded the court of its prior ruling (A599–601).

Based on Springs's violation of the order in limine and the court's failure to sustain the defense's objection, the City moved for a mistrial, which the court denied (A608–10). Instead, the court conferred with the parties and issued a limiting instruction, telling the jury to disregard Springs's testimony about anything that happened after his transfer to Engine 67, since those allegations were "the subject of a different lawsuit" that had been dismissed (A610–14, 617–18). The court reminded the jury that "[t]he fact that he got transferred is relevant. … But just the fact that he got transferred, nothing else" (A617–18).

### D. The defense's motion for judgment as a matter of law and the jury's unanimous defense verdict

After the close of Springs's case, the defense moved for judgment as a matter of law, arguing, as relevant, that Springs had failed to establish a prima facie case of retaliation (A811–12). The court reserved its ruling (A813). The defense renewed its motion after it had rested, and the court once again reserved its ruling (A958–59). For his part, Springs never

moved for judgment as a matter of law or judgment notwithstanding the verdict (*see* A956–1072).

After deliberating for less than an hour and a half, the jury reached a unanimous defense verdict, finding that the City had not retaliated against Springs for filing the EEO complaints (see A1065–69). After the jury was excused, the court noted that it "very likely" would have granted the City's motions for judgment as a matter of law (A1071). The court then issued a judgment dismissing the complaint (*see* A1073).

## STANDARD OF REVIEW
## AND SUMMARY OF ARGUMENT

Springs makes no argument about the district court's summary judgment determination or the sufficiency of the evidence supporting the jury's unanimous verdict (*see* Brief for Appellant ("App. Br.) 19–43). Instead, he argues that the court's order of a separate trial for the claims against the City unduly prejudiced him, first, by preventing him from mounting evidence of the individual firefighters' alleged misconduct and, second, by denying him an adequate continuance to prepare for trial. Finally, he argues that Judge McMahon denied him a fair trial by improperly commenting on testimony and issuing a limiting instruction that conveyed judicial bias. His arguments are meritless.

17

This Court reviews the district court's decision to bifurcate trials under FRCP 42(b) for an abuse of discretion, *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999), and applies the same standard of review to denials of continuances, *United States v. O'Connor*, 650 F.3d 839, 854 (2d Cir. 2011). Here, Springs failed to show that the court abused its discretion on either issue. The court providently ordered a separate trial for the City, since trying all of Springs's claims together would have risked confusing the jury and prejudicing the defendants. And Springs has no reason to complain about the court's calendar management, since he had more than two and a half years to prepare for his trial against the City.

Springs's claim that Judge McMahon was biased is both unpreserved and meritless. Springs failed to object at trial to any of the comments that he now contends were prejudicial, thereby depriving the district court of the opportunity to consider and address his concerns and preventing meaningful appellate review. His claims of bias would provide no basis for reversal in any event. This Court will reverse a judgment after a jury verdict for judicial bias only where "the entire record demonstrates" such partiality for one side that the jury could not have

reached a fair verdict. *United States v. Mulder*, 273 F.3d 91, 109 (2d Cir. 2001) (cleaned up).[2] Here, however, Springs merely cites two examples of what he describes as bias: the court's admonishment during his cross-examination that he should provide responsive answers, and a limiting instruction that the jury should not consider testimony that transgressed the in limine ruling. Neither example showed bias, let alone bias sufficient to have prejudiced the jury's deliberations.

## ARGUMENT

### THIS COURT SHOULD AFFIRM THE JUDGMENT ENTERED ON THE JURY'S UNANIMOUS VERDICT

**A. The district court soundly exercised its discretion in ordering a separate trial for the City.**

**1. Bifurcation eliminated the possibility of prejudice.**

Federal Rule of Civil Procedure 42(b) gives district courts "broad discretion to order separate trials" to avoid prejudice, inconvenience, or inefficiency. *Smith v. Lightning Bolt Prods.*, 861 F.2d 363, 370 (2d Cir. 1988); *see Amato*, 170 F.3d at 316. Here, the district court providently

---

[2] This brief uses "cleaned up" to indicate that internal quotation marks, alterations, or citations have been omitted from quotations.

exercised its discretion, and Springs offers no reason to second-guess its decision now.

Indeed, the risk of prejudice alone warranted bifurcation of the trials. *See Amato*, 170 F.3d at 316 (bifurcation warranted "where one party will be prejudiced by evidence presented against another party"). Allowing the jury to hear days of testimony about the individual firefighters' alleged misconduct might well have been confusing and prejudicial. Their alleged actions all preceded the filing of the EEO complaints underlying Springs's retaliation claims against the City, and Springs did not contend that they were involved in any retaliatory actions. And although the City employed the firefighters, it could not be held liable for any of their alleged misconduct, given the district court's dismissal on summary judgment of the claims against the City based on that conduct. The very real possibility that the jury would be confused by a trial combining unrelated issues involving different parties justified separate trials. *See id.*; *see also Vichare v. AMBAC Inc.*, 106 F.3d 457, 466 (2d Cir. 1996) (bifurcation proper where issues involved different evidence).

In contrast, Springs's conclusory argument that bifurcation "only served to complicate the trial and unduly prejudice plaintiff" makes little sense (App. Br. 28). Springs never explains how a shorter trial on a single issue with fewer witnesses, fewer attorneys, fewer limiting instructions, and fewer opening and closing statements possibly could have increased the trial's complexity (*see id.* 20–32). Indeed, it's plain that the opposite is true.

Nor does Springs explain how he was prejudiced by the trials' bifurcation, beyond claiming that he was forced to proceed "without the benefit of having evidence of the underlying discriminatory conduct of the Individual Defendants before the jury" (*id.* at 19). But the individual defendants' conduct was not at issue in his claims against the City, and focusing the jury's attention squarely on their actions would have risked prejudicing the City. In any event, Springs can hardly complain on this ground, since he was permitted to give detailed testimony about the two alleged hazing incidents (*see* A561–63). And he did so without having to answer any mitigating evidence the individual firefighters might have presented had the claims against them been part of the trial.

21

The district court's initial denial of the City's motion for a separate trial does not change this analysis. "It is well established that the interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment, and may be modified to the same extent if the case is reassigned to another judge." *Matter of United States*, 733 F.2d 10, 13 (2d Cir. 1984). And here, the court did not abuse its broad discretion by modifying a ruling predicated on a different judge's "busy trial calendar" and the "inconvenience" to that judge of conducting two separate trials (A256). *See id*.

Springs's reliance on "cases where no bifurcation was ordered [to argue otherwise] is entirely unpersuasive," since, "[b]y its very nature, discretion yields differing outcomes." *Amato*, 170 F.3d at 316. Those cases show, at most, that it might have been possible to use limiting instructions to mitigate the prejudice to defendants had the trials been conducted together (*see* App. Br. 23–28 (citing, among other cases, *Schoolcraft v. City of N.Y.*, 133 F. Supp. 3d 563, 571 (S.D.N.Y. 2015))). But bifurcation provided a more effective safeguard, and the district court soundly exercised its discretion in so ordering.

22

**2. Springs's claim that he lacked time to prepare for trial after bifurcation withers under scrutiny.**

"A district court has broad discretion to grant or deny a motion for a continuance," and the court soundly exercised that discretion here. *United States v. Cusack*, 229 F.3d 344, 349 (2d Cir. 2000). Certainly, Springs's ability to try his case was not "substantially impaired," where the court granted several continuances, and Springs had well over two and a half years to prepare for trial after the bifurcation order and the City's final discovery disclosures. *O'Connor*, 650 F.3d at 854.

In arguing otherwise, Springs baldly misstates the record. He claims, for instance, that the court's "severance order on the eve of trial, coupled with … a last-minute 'dump' of 750 pages of additional discovery, tainted the subsequent proceedings to the extent that [he] was deprived of his right to a fair trial" (App. Br. 31). But that is not what happened. After ordering a separate trial for the City on November 11, 2019, the court granted an initial continuance of that trial to February 3, 2020, giving the parties an additional two and a half months to prepare (*see* A24). The trial was then continued several more times, finally beginning in July 2022, more than two and a half years after the severance order

and the City's final discovery disclosures (*see* A26–28, 463, 525). Given this timeline, it cannot be said that Springs's ability to try his case against the City was substantially impaired. *See O'Connor*, 650 F.3d at 854.

Finally, to the extent that Springs argues that the court's initial one-day continuance of his trial against the individual defendants prejudiced that proceeding (*see* App. Br. 22, 30), such a claim is unreviewable in this appeal, since Springs dismissed his claims against the individual defendants voluntarily. He is not aggrieved by the dismissal of claims on his own motion. *Cf. Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 333 (1980) ("A party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it."). Nor is there any evidence, beyond Springs's unsupported speculation, that his trial counsel's hand was forced by timing considerations (*see* App. Br. 22). On the contrary, his legal team informed the court that his motion for dismissal was informed by "legal analysis" after "great deliberation and research" (A445). Springs may now regret that decision, but his "attorney's failure to evaluate carefully the legal consequences of a chosen course of action provides no basis for

relief from a judgment." *Nemaizer v. Baker*, 793 F.2d 58, 62 (2d Cir. 1986).

### B. Springs's claims of judicial bias are unpreserved and unfounded.

Springs also maintains that purported bias by Judge McMahon tainted the jury's verdict. But this argument fails out the gate, as Springs did not preserve this challenge by objecting to the comments of which he now complains. *See United States v. Vega*, 589 F.2d 1147, 1152 (2d Cir. 1978) (appellant waived objection to trial judge's questioning of witness by failing to object). His "failure to object not only precludes" appellate review, but, tellingly, "indicates [his] counsel's own difficulty in finding any prejudice." *United States v. Canniff*, 521 F.2d 565, 572 (2d Cir. 1975) (discussing unpreserved claim of prosecutorial misconduct).

Even if Springs had made timely objections, however, "an examination of the entire record" offers no basis for finding that the jurors could have "been impressed with the trial judge's partiality to one side to the point that this became a factor" in their verdict. *Mulder*, 273 F.3d at 109 (cleaned up). "[E]ven a stern and short-tempered judge's ordinary efforts at courtroom administration," including "expressions of

impatience, dissatisfaction, annoyance, and even anger," do not justify a finding of judicial bias. *Liteky v. U.S.*, 510 U.S. 540, 555–56 (1994). Here, Springs identifies nothing more.

Although Springs complains that he was subjected to a "demeaning barrage of comments and criticisms of him by the trial judge in the presence of the jury" (App. Br. 1), most of the comments he cites could not have affected the verdict because they were, in fact, made during sidebars (*see id.* at 35–37, 40). He argues, for instance, that Judge McMahon demonstrated antipathy to him by suggesting that he "had been 'coached' or 'rehearsed' by counsel" (*id.* 40). Yet the court only made such comments during sidebars, never in the jury's presence (*see* A610, 612–13).[3]

In fact, Springs identifies only two examples of what he describes as the court's prejudicial comments to the jury (*see* App. Br. 15–18, 37),

---

[3] Judge McMahon's comments do not reveal any bias against Springs or his counsel, as he seems to suggest on appeal (*see* App. Br. 36–38). Although Springs quotes her comment that she was "livid" at his violation of her order (App. Br. 36), he fails to mention that she also admonished defense counsel in the same sidebar to "cut the histrionics" and informed defense counsel that his failure to remind her of her prior ruling was "not good lawyering" (A608–09). Nor does Springs quote her remark, in a pretrial conference, that it "sound[s] to me like a great deal of hazing goes on in the fire department" (A472), or her comment in a sidebar that, "if the jury credits [Springs's] testimony and that stuff had happened to me, I'd be taking six different medications too" (R615).

neither of which, "whether viewed singly or in combination," gives rise to "an inference that she held any impermissible bias." *United States v. English*, 629 F.3d 311, 321 (2d Cir. 2011). First, Springs cites Judge McMahon's admonishments to provide responsive answers during his cross-examination (*see* App. Br. 15–18).[4] But there was nothing improper in the court's insistence that he "answer the question[s]" he was asked, after he persisted in answering the defense's yes-or-no questions with unresponsive monologues (*see, e.g.*, A619–23).

Even "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555. And here, the record shows, at most, that Judge McMahon was "abrupt with witnesses." *Henderson v. City of N.Y.*, 571 F. App'x 42, 44 (2d Cir. 2014). In any event, any possible prejudice was cured by her instruction that her rulings on objections should not be understood to suggest "that I think this side is right or I think that side is right" (A979).

---

[4] Although not discussed in the argument section of Springs's brief (*see* App. Br. 32–43), these comments are quoted at length in his statement of the case (*see id*. at 15–18).

27

*See United States v. Mickens*, 926 F.2d 1323, 1327–28, 1328 n.1 (2d Cir. 1991) (noting efficacy of similar curative instruction).

Second, and equally meritless, is Springs's argument that he was prejudiced by the court's curative instruction to disregard his testimony about anything that happened after his transfer to Engine 67 (*see* App. Br. 37). Springs failed to object to that instruction when the court proposed it in a sidebar (*see* A610–16), and he certainly has not shown that it was plain error. *See United States v. Salameh*, 152 F.3d 88, 145 (2d Cir. 1998) ("When a defendant fails to object to the curative instruction at trial, we review the court's instruction for plain error.").

Indeed, Springs is mistaken that the instruction was "factually incorrect" because he never testified about "things that occurred" after the transfer (App. Br. 37). On the contrary, his testimony that he left Engine 67 because he "was being isolated" and "shunned" there, and that he had subsequently been "scheduled for termination," plainly violated the court's order precluding any reference to events after the transfer (A597–99; *see* A484–88). Nor was Springs prejudiced by the court's remark that those events were "the subject of a different lawsuit" that "was dismissed" (A617; *see* App. Br. 37), since he opened the door to that

28

information by "introduc[ing] inadmissible evidence on the same issue." *United States v. Elfgeeh*, 515 F.3d 100, 128 (2d Cir. 2008) (cleaned up). Mention of the other lawsuit was necessary to correct the false impression he had created that important evidence of additional retaliation was being kept from the jury on a technicality. *Id.*

On this record, it cannot be said that Judge McMahon's comments conveyed bias for one party, let alone that they could have affected the jury's determination. Even if Springs had preserved this issue, he identifies no basis for disturbing the jury's verdict.

## CONCLUSION

This Court should affirm the judgment entered on the jury's unanimous verdict.

Dated:  New York, NY
March 17, 2023

Respectfully submitted,

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for Appellees the City of New York, Daniel A. Nigro, And Edward Vreeland

By: _____
BENJAMIN H. POLLAK
Assistant Corporation Counsel

100 Church Street
New York, NY 10007
212-356-0843
bpollak@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
BENJAMIN H. POLLAK
*of Counsel*

30

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 5,777 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____

BENJAMIN H. POLLAK